# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00641-SCT

*JAMES C. P. HARTMAN, DECEASED*

*v.*

*NED G. McINNIS, JR.*

*BANCORPSOUTH*

*v.*

*NED G. McINNIS, JR., MARY DEANE McINNIS,*
*RON NELSON AND JAMES C.P. HARTMAN,*
*DECEASED AND RONSON CONSTRUCTION*
*SYSTEMS, INC.*


| | |
|---|---|
| DATE OF JUDGMENT: | 01/28/2006 |
| TRIAL JUDGE: | HON. SEBE DALE, JR. |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT/ CROSS-APPELLEE HARTMAN: | CLARENCE WEBSTER, III |
| | W. WAYNE DRINKWATER |
| | ROBIN L. ROBERTS |
| ATTORNEYS FOR APPELLANT/ CROSS-APPELLEE BANCORPSOUTH: | JOE D. STEVENS |
| | JACK W. LAND |
| | TRACY KAY BOWLES |
| ATTORNEY FOR APPELLEES MCINNIS: | RAY T. PRICE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED - 11/29/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     BancorpSouth and Jim Hartman appeal from a judgment of the Chancery Court of Forrest County, finding that Hartman, Ronson, and Nelson owed Ned G. McInnis, Jr., and Mary Deane McInnis a deficiency judgment. Determination of the deficiency involved a foreclosure sale of the property Ronson purchased from the McInnises by means of tendering to them a promissory note and deed of trust, both of which the McInnises assigned to BancorpSouth. This Court considers two questions: Whether BancorpSouth was entitled to a deficiency judgment and whether the McInnises were entitled to a deficiency judgment. We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

¶2.     Ned and Mary McInnis purchased a number of rental properties through loans secured by deeds of trust (the McInnis deeds of trust) with BancorpSouth. The McInnises entered into a contract on November 6, 2003, to sell eighteen parcels to James Hartman. At closing, on November 14, 2003, Hartman paid cash for a portion of the properties. Additionally, Hartman had Ron Nelson, owner of  Ronson Construction Systems, the entity to which Hartman previously had agreed to sell the remaining properties (the Ronson properties), to tender to the McInnises a promissory note (the Ronson note) for the properties. The note was secured by a deed of trust (the Ronson deed of trust) for which Hartman was a guarantor. The parties agreed the McInnis deeds of trust would be senior to the Ronson deed of trust.

¶3.     Additionally, on November 14, 2003, BancorpSouth, the McInnises, Ronson, and Hartman executed the "Agreement" where, in exchange for satisfaction of certain terms and

2

conditions, BancorpSouth agreed to refrain from exercising the due-on-sale clause applicable against the McInnis deed of trust. The McInnises were to assign to BancorpSouth both the Ronson note and the Ronson deed of trust. Ronson was to make monthly payments on the note to BancorpSouth, and these payments would apply to the outstanding balance on the McInnises' loans. BancorpSouth would issue any excess from the payments to the McInnises.

¶4.     The McInnises assigned the Ronson note and deed of trust to BancorpSouth on November 14, 2003. Ronson made a number of payments to BancorpSouth, but eventually ceased payments. Consequently, in April 2004, the McInnises filed suit against Ronson, Nelson, and Hartman in the Chancery Court of Forrest County. The complaint raised five claims: (1) breach of contract; (2) bad-faith breach of contract; (3) accounting and specific performance; (4) intentional interference with business relations; and (5) breach of the duty of good faith and fair dealing. BancorpSouth was added as a party defendant.

¶5.     In November 2004, BancorpSouth filed a cross-claim for judicial foreclosure. Upon the oral stipulation of both parties, the trial court issued an Order authorizing BancorpSouth to initiate foreclosure after December 1, 2004, on the Ronson properties. The trustee sold the properties located in Jones County at a public auction at the Jones County courthouse on May 3, 2005, to BancorpSouth, the sole bidder, for $32,200. Similarly, the properties located in Forrest County were sold at public auction at the Paul B. Johnson, Jr., Chancery Court in Hattiesburg, Mississippi, on May 3, 2005, to BancorpSouth, the sole bidder, for $167,700. BancorpSouth asserted that, with the costs of  $920.70 for publication and $2,079 for the

3

trustee, the sales resulted in a deficiency of $259,711.91 from the $456,169.05 owed on the note on the date of sale.

¶6.     After a trial, the chancery court issued an opinion, finding that BancorpSouth was precluded from obtaining a deficiency judgment against the McInnises, and awarding the McInnises a deficiency judgment with interest against Ronson, Nelson, and Hartman. From this judgment both Hartman and BancorpSouth appeal.

## DISCUSSION

¶7.     This Court will not disturb the findings of a chancellor unless the chancellor was clearly erroneous or an erroneous legal standard was applied. ***Bell v. Parker***, 563 So. 2d 594, 596-97 (Miss. 1990). In other words, this Court must respect the chancellor's findings of fact where supported by credible evidence and not manifestly wrong. ***Newsom v. Newsom***, 557 So. 2d 511, 514 (Miss. 1990).

> **I.     Whether BancorpSouth Was Entitled to a Deficiency Judgment.**
>
> > **A.     Whether the Trial Court Erred in Finding That BancorpSouth Owed and Breached a Fiduciary Duty to the McInnises.**

¶8.     The trial court held that BancorpSouth was precluded from obtaining a deficiency judgment because it breached its fiduciary duty to the McInnises. The trial court found that BancorpSouth's agreement to tender to the McInnises the excess from the payments on the Ronson note, which was assigned to BancorpSouth, created a fiduciary relationship. The trial court further found that BancorpSouth acted in derogation of its fiduciary duty when it refused the McInnises' request to collect rent. The McInnises made the request due to their

4

discovery of Ronson's failure to collect rent and consequent inability to make the loan payments.

¶9.    The McInnises assert that a fiduciary-duty relationship was created when BancorpSouth imposed as conditions of the sale the wraparound mortgage and assignment of the Ronson note. BancorpSouth argues that it had no fiduciary duty to the McInnises since the relationship was simply an arms-length business transaction involving a normal debtor-creditor relationship.

¶10.    This Court has stated:

> "[O]rdinarily a bank does not owe a fiduciary duty to its debtors and obligors under the UCC." *Peoples Bank & Trust Co. v. Cermack*, 658 So. 2d 1352, 1358 (Miss 1995), overruled on other grounds by *Adams v. U.S. Homecrafters Inc.*, 744 So. 2d 736 (Miss. 1999). "This Court has never held that the relationship between a mortgagor and mortgagee is a fiduciary one." *Hopewell Enters., Inc. v. Trustmark Nat'l Bank*, 680 So. 2d 812, 816 (Miss. 1996). An arms length business transaction involving a normal debtor-creditor relationship does not establish a fiduciary relationship. *Id.* This Court "has repeatedly held that the power to foreclose on a security interest does not, without more, create a fiduciary relationship." *Gen. Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262, 270 (Miss. 1999). Simply put, "a mortgagee-mortgagor relationship is not a fiduciary one as a matter of law." *Hopewell Enters.*, 680 So. 2d at 816.

*Burgess v. Bankplus*, 830 So. 2d 1223, 1227- 28 (Miss. 2002). Also, the party asserting the existence of a fiduciary relationship bears the burden of proving its existence by clear and convincing evidence. *AmSouth Bank v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002) (citing *Smith v. Franklin Custodian Funds, Inc.*, 726 So. 2d 144, 150 (Miss. 1998)).

¶11.    This Court considers a number of factors in determining whether a fiduciary relationship exists in a commercial transaction, including:  whether (1) the parties have shared goals in each other's commercial activities, (2) one of the parties places justifiable

5

confidence or trust in the other party's fidelity, and (3) the trusted party exercises effective control over the other party. *Id.* (citing *Smith*, 726 So. 2d at 151). The mere fact of dealings with a lender does not meet these criteria. *Id.* These factors must exist beyond those features common to every free-market transaction, such as the hope by both parties that the transaction is profitable, trust of the lender in handling the loan, and the lender's greater familiarity with the loan process. *Id.*

¶12.    As BancorpSouth contends, the burden lies with the McInnises to establish, by clear and convincing evidence, the existence of a fiduciary relationship. *AmSouth Bank v. Gupta*, 838 So. 2d at 216. The McInnises contend the test is met. They state:

> On the first prong, both the McInnises and the Bank had a shared goal in entering the agreement that the loans of the McInnises to Bancorp would be paid. On the second, the McInnises clearly relied on Bancorp to enforce all of the rights they had under the note and deed of trust when they assigned it to Bancorp, giving up their own rights to do so in favor of the presumably more able bank. On the third, Bancorp had not just effective, but total control over the McInnises' rights under the assignment which it requires as part of the November 14[th] (sic), 2003 agreement.

¶13.    The McInnises describe features common to every free-market assignment between a creditor and debtor–mutual hope that the loan would be paid, trust of BancorpSouth in handling the loan, and the tender of collateral, including control of that collateral, in exchange for the loan. This Court has issued no precedent which establishes that an assignee/assignor relationship, as a matter of law, is a fiduciary one. As in *AmSouth v. Gupta*, we find the merely common features presented in the case at bar to be insufficient to create a fiduciary relationship.

¶14. In the present case, the record is devoid of facts which would take the relationship between BancorpSouth and the McInnises out of the scope of the generally non-fiduciary mortgagor/mortgagee relationship. No evidence was presented or precedent provided to support a finding that the relationship was anything other than an arms-length business transaction involving a normal debtor-creditor relationship where, as is common, the debtor tendered to the creditor collateral security, the assignment of a promissory note. Accordingly, this Court should find that the assignor/assignee relationship, like the mortgagor/mortgagee relationship, is not as a matter of law a fiduciary relationship. Therefore, since the McInnises failed to put forth sufficient evidence of a fiduciary relationship, the trial court erred in finding that a fiduciary relationship existed and in barring BancorpSouth from relief on the basis thereof.

**B.** **Whether the Foreclosure Sales Bids Served as an Adequate Determination of Fair Market Value So As to Establish Deficiency.**

¶15. The trial court also found that BancorpSouth failed to establish the fair market value of the Ronson properties, which was necessary to determine whether a deficiency existed after the foreclosure sale.

**1.** **Whether the Foreclosure Sale Was Commercially Reasonable.**

¶16. BancorpSouth decided to foreclose on the Ronson deed, which was junior to the McInnis deed. Accordingly, the trustee announced at the foreclosure sale that the sale would be subject to the liens of the McInnis deeds of trust, which BancorpSouth held. The trial

7

court found this announcement discouraged any potential bidders other than BancorpSouth; and therefore, the sale was not a determinant of the fair market value.

¶17.    This Court has stated with regard to a creditor conducting a foreclosure sale of a debtor's property:

> if the secured creditor is authorized to foreclose by power of sale, after the debtor's default and upon compliance with the deed of trust or other instrument, the secured creditor may sell any or all of the real estate that is subject to the security interest in its then condition or after any reasonable rehabilitation or preparation for sale. Every aspect of the sale, including the method, advertising, time, place and terms, must be commercially reasonable. This is an objective standard.

*Wansley v. First Nat'l Bank*, 566 So. 2d 1218, 1223 (Miss. 1990). Thus, the first question is whether, in consideration of the trustee's statement, the sale was commercially reasonable.

¶18.    "[A]bsent special circumstances, a foreclosure sale by the trustee in a junior deed of trust is made subject to prior liens on the property, and the trustee can sell and convey no better title than he acquired. Title vests in the purchaser subject to the prior lien." *Reese v. Ivey*, 324 So. 2d 756, 757 (Miss. 1976) (citing *Staunton Military Academy v. Dockery*, 244 N.C. 427, 94 S.E.2d 354 (1956)). Announcing the amount due on a senior deed of trust enables bidders to take the prior lien into consideration in making bids, since the successful bidder buys subject to the prior lien. *Reese v. Ivey*, 324 So. 2d at 757.

¶19.    The Agreement signed by BancorpSouth, the McInnises, Nelson, and Hartman provides that the parties agreed the Ronson deeds of trust would be junior to the McInnis deeds of trust. BancorpSouth asserts that the trustee's statement that the properties were subject to BancorpSouth's lien did not prohibit the foreclosure sale from being commercially

8

reasonable. This Court agrees. In this case, the mere announcement that the properties were subject to a lien is insufficient to refute the commercial reasonableness of the sale. Thus, the trial court erred in finding that announcement prevented the sale price from serving as fair market value.

### 2. Whether the Foreclosure Sale Price Represented the Fair Market Value of the Properties.

¶20. The trial court found that BancorpSouth failed to establish that the foreclosure bids represented the fair market value of the Ronson properties. BancorpSouth argues that the chancery court erred in precluding the foreclosure sale from serving as a determinant of fair market value of the properties sold when it presented sufficient evidence to establish fair market value. Thus, the second question is whether the sale price was representative of the fair market value of the properties.

¶21. "[T]he creditor has no right to a deficiency judgment until he satisfies the court that it would be equitable, in the light of the sale price, to authorize a deficiency judgment." *Wansley*, 566 So. 2d at 1225; *Federal Land Bank v. Wolfe*, 560 So. 2d 137, 141 (Miss. 1989); *Lake Hillsdale Estates, Inc. v. Galloway*, 473 So. 2d 461, 466 (Miss. 1985). "[S]omething more than a difference between the price paid at the foreclosure and the amount of the indebtedness must be demonstrated before the mortgagee is entitled to a deficiency judgment." *Wansley*, 566 So. 2d at 1224 (quoting *Lake Hillsdale*, 473 So. 2d at 466).

¶22. "The mortgagee's right to a deficiency decree usually depends on the facts and circumstances of each case, and, since the mortgaged premises constitute the primary fund

9

for the payment of the mortgage debt, it is only where the mortgagee has endeavored to collect it out of the land that a just judgment for deficiency can be entered." *Id.* Thus, the mortgagee first must show that it has endeavored to collect the indebtedness out of the land. *Lake Hillsdale*, 473 So. 2d at 466 (citing *Mississippi Valley Title Ins. Co. v. Horne Constr. Co.*, 372 So. 2d 1270, 1272 (Miss. 1979)).

¶23. Then, the mortgagee must show whether the value of the property satisfies the debt of the mortgagor or creates a surplus. *Id.* Where the foreclosing creditor buys at foreclosure, it must give the debtor fair credit for the commercially reasonable value of the collateral. *Wansley*, 566 So. 2d at 1221-22, 1224-25. To determine the adequacy of the purchase price in satisfying the debt, the mortgagee must establish the fair market value of the property. *Allied Steel Corp. v. Cooper*, 607 So. 2d 113, 118-19 (Miss. 1992) (citing *Haygood v. First Nat'l Bank*, 517 So. 2d 553, 556; *Lake Hillsdale*, 473 So. 2d at 465); *Wansley*, 566 So. 2d at 1224. "Fair market value" is defined as "[t]he amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Black's Law Dictionary* 414 (6th ed. 1991). The determination of the fair market value is a question for the trier of fact, and this Court will respect the trial court's findings of fact when they are supported by reasonable evidence in the record and are not manifestly wrong. *Allied Steel v. Cooper*, 607 So. 2d at 118-19 (citing *Newsom*, 557 So. 2d at 514; *Myles v. Cox*, 217 So. 2d 31, 34 (Miss. 1968)).

¶24. BancorpSouth contends that it provided sufficient evidence of fair market value and cites *Allied Steel*, 607 So. 2d 113, for the type of evidence this Court considers sufficient at

trial to support the trial court's finding with regard to determination of fair market value. The evidence in *Allied Steel* presented for fair market value consisted of "testimony by representatives of the parties as well as by two licensed real estate appraisers, whose valuations of the property were made a part of the record." *Id.* at 119. In *Allied Steel*, Cooper appealed this Court's ratification of the sheriff's foreclosure sale of the property to the lienholders. *Id*. The lienholder's appraisal estimate was

> explained in detail in his comprehensive appraisal analysis as well as in more than forty pages of testimony. His appraisal also took into consideration material factors such as zoning, the area's surplus of commercial space, and the depressed economy of the community and its impact on local real estate values, which had declined significantly since [Appellants] purchased the property in 1984.

*Id.* at 120. Contrastingly, the court found that the Cooper's appraisal lacked support and detail in that the appraiser submitted a brief letter appraisal in which he "reiterated that he had used a replacement cost approach, less depreciation, but did not explain what sort of depreciation allowance he had factored in,"merely acknowledging that the building "was in dire need of repairs" and that the floor was "in pretty bad shape," and he further "did not take into consideration factors such as the monthly income the property had been generating or the potential uses of the building."*Id.* at 119. In choosing between the two vastly different opined fair market values, the trial court ruled in favor of the lienholders' appraisal. *Id.* at 118, 120. This Court agreed, finding the lienholders' appraisal sufficient to support the trial court's findings. *Id.* at 119-20.

¶25. The burden is on the mortgagee to establish fair market value from which it can be determined whether a deficiency exists. This Court has not promulgated specific

requirements for establishing fair market value. However, simply looking at the property, making vague notes regarding the physical condition of the property and issuing a value therefrom are insufficient to meet the mortgagee's burden.

¶26.    BancorpSouth contends that through the trial testimony of Zeke Powell, a BancorpSouth loan officer, it clearly established that its bid amounts represented fair market value. Powell testified that he and Carol Daniel, the senior credit officer of the bank, inspected the properties the day before foreclosure. Powell and Daniel drove to each individual parcel but did not enter each rental property or each apartment within a unit. They also took pictures of most of the properties. Neither was designated as an expert.

¶27.    Powell and Daniel reviewed the appraisals for the properties on file at BancorpSouth titled "Desktop Underwriter Quantitative Analysis Appraisal Report" and dated June 2004, approximately one year prior to the foreclosure sale, in which the suggested value of the fourteen properties totaled $297,500. For each property, these appraisals included a report providing, inter alia, a detailed description of the location of the property, means for ascertaining the physical characteristics – interior and exterior inspection, exterior inspection from the street, etc. – and comparable sales values of three other properties within a half mile in proximity deemed similar in neighborhood classification, age, physical condition and gross living area.[1]

¶28.    Powell, on the other hand, provided BancorpSouth a figure for each property referred to as "officer's evaluation," which was Powell's estimate of the worth of the property. These

---

[1]Apparently, each report was three pages in length, but only "page 1 of 3" of each report was provided in the record.

evaluations included comments, such as "need minor repairs," "house has deteriorated since June 2004 appraisal," and "[d]rive-by appraisal could not detect problems found on inside of house." Powell testified that BancorpSouth's total bid of $199,900 on the properties was a "commercially reasonable amount" without explaining how BancorpSouth arrived at its bid price or providing the process by which he calculated depreciation from the values in the appraisals on file. Powell testified "[a]ll I was asked to do was to look at the appraisals that Mr. Lightsey had made [in June 2004]. And I took those and went to the properties and kind of looked with Carol and we kind of eyeballed it as to see if there were any deterioration or other problems."

¶29.    In addition to BancorpSouth's self-inspection, the court had an indication of fair market value from the price at which BancorpSouth sold two of the properties during the five months between the foreclosure sales and the trial. The property at 129 Saucier Drive, Hattiesburg, Mississippi, was appraised in June 2004 for $40,000; estimated on May 2, 2005, by Daniel and Powell to be worth $36,000; sold at the foreclosure sale on May 3, 2005, to BancorpSouth for $25,200; and sold to a third party for $29,000. Another property at 1005 Mamie Street, Hattiesburg, Mississippi, was appraised in June 2004 for $35,000; estimated on May 2, 2005, by Daniel and Powell to be worth $24,500; sold at the foreclosure sale on May 3, 2005, to BancorpSouth for $24,500; and sold to a third party for $28,000.

¶30.    While these numbers provide an indication of the price an informed, willing buyer would pay for these two properties, there is no such indication for the remaining twelve properties by sale, appraisal, adequate inspection or otherwise. BancorpSouth merely engaged in "eyeballing" properties, without providing an explanation on how the value was

13

deduced or even entering all the properties for which a value was estimated. For lack of evidence, this Court is unable to determine whether the foreclosure sale price represented fair market value and thus, whether the difference between the sales price and the indebtedness accurately represents the deficiency.

¶31. BancorpSouth claims the trial court erred in not recognizing that it was due a deficiency after the foreclosure sale. Ronson's promissory note for the fourteen properties at the time of purchase on November 14, 2003, was for $664,683.90. Both parties stipulated that the total indebtedness on these properties outstanding at the time of the foreclosure sale was $456,169.05. BancorpSouth asserted that, with the expenses of publication and trustee's fees, the total foreclosure sale price of $199,900 resulted in a deficiency of $259,711.91. As previously stated, to ascertain the accuracy of this purported deficiency, BancorpSouth must have established that its bids at the foreclosure sale represented the fair market value of the property.

¶32. The trial court found that "no deficiency which may be ascertained with certainty has been determined" in that BancorpSouth neither provided proper determination of the fair market value prior to the foreclosure sale by appraisal or otherwise nor demonstrated "willing seller-willing buyer" sales when BancorpSouth had sold only two of fourteen properties it purchased. We agree. The trial court correctly found that BancorpSouth failed to establish fair market value of the properties, and thus, the amount of deficiency could not be determined.

¶33. Also with regard to the calculation of the deficiency in the present case, it also should be noted that the trial court found that BancorpSouth's interests under the McInnis deeds of

trust and the Ronson deeds of trust merged. As Mississippi has yet to provide instruction on calculating a deficiency for a wraparound mortgage, and the creation of such guidance is unnecessary for this Court's decision, this Court declines to address that issue here.

## II. Whether the McInnises Were Entitled to a Deficiency Judgment.

¶34. The dispute concerning the McInnises' entitlement to a deficiency judgment is essentially a question of whether the McInnises have standing to bring suit with regard to the cessation of payments on the Ronson note.

¶35. The McInnises contend that they have standing as third-party beneficiaries under *Burns v. Washington Savings & Great Southern Savings & Loan Association*, 251 Miss. 789, 171 So. 2d 322 (1965). However, the third-party beneficiary concept, as laid out in *Burns*, does not apply to this case. The McInnises are not third-party beneficiaries with respect to the Agreement or the assignment. *Burns* explains the concept of a third-party beneficiary, stating that "*[a] third person* may sue on a contract made for his benefit between others to the consideration of which he is a *stranger*." *Burns*, 251 Miss. at 795 (emphasis added). The concept of gaining enforcement rights by way of third-party beneficiary status does not apply to the McInnises when they were parties, signatories, to the Agreement as well as the assignment. Thus, this argument is without merit.

¶36. The McInnises also contend that they have standing as parties to the Agreement in which BancorpSouth provides the conditions and terms of the sale, including that the McInninses would assign the Ronson note and deed of trust and that BancorpSouth would credit excess from Ronson's payments to the McInnises. Hartman asserts that since the McInnises assigned the promissory note and the deed of trust, they do not own them and thus

15

may not sue under them. Hartman relies on *EB, Inc. v. Allen*, 722 So. 2d 555, 564 (Miss. 1998), and *McKinley v. Lamar Bank*, 919 So. 2d 918, 928 (Miss. 2005), for the premise that an unconditional assignment of a debt transfers all rights to receive debts due or becoming due under the contract to the assignor.

¶37.    *EB, Inc. v. Allen* and *McKinley v. Lamar Bank* are pertinent. They each state:

> "Generally, the intention of the parties ascertained from the *entire transaction*, including conduct, determines whether the assignment is absolute or intended only as a collateral security."

. . . .

> "[A] valid assignment of a debt or contract conveys the entire interest of the assignor to the assignee, and thereafter the assignor has no interest therein."

. . . .

> "As a general rule, a valid and unqualified assignment operates to transfer to the assignee all the right, title, or interest of the assignor in the thing assigned, but not to confer upon the assignee any greater right or interest than that possessed by the assignor."

*McKinley v. Lamar Bank,* 919 So. 2d at 928 (quoting *International Harvester Co. v. Peoples Bank & Trust Co.*, 402 So. 2d 856, 861 (Miss. 1981)); *EB, Inc. v. Allen*, 722 So. 2d at 564 (quoting *International Harvester Co. v. Peoples Bank & Trust Co.*, 402 So. 2d 856, 861 (Miss. 1981) (emphasis added)).

¶38.    Looking to the entire transaction, we will examine the assignment and then the Agreement. In *International Harvester Co. v. Peoples Bank and Trust Co.*, this Court addressed whether, in assigning a debt as collateral, an assignor assigned all of its rights to collect on that debt to the assignee. *Peoples Bank*, 402 So. 2d 856. This Court stated "[i]t has long been held that a valid assignment of a debt or contract conveys the entire interest

16

of the assignor to the assignee, and thereafter the assignor has no interest therein. In this State this has been held true, even when the debtor might not have notice of the assignment." ***Id.*** at 861. Upon discovery that the assignment terms were unconditional, lacking any indication of either a conditional or collateral assignment, this Court found the parties intended to assign all rights. ***Id.*** at 860-62.

¶39. The assignment in the case at bar, titled "ASSIGNMENT OF PROMISSORY NOTE AND DEED OF TRUST," states:

> FOR AND IN CONSIDERATION of BancorpSouth Bank's agreement not to exercise its option to accelerate the entire indebtedness due and owing it on property serving as collateral security for loans made by BancorpSouth Bank to the undersigned, the receipt and sufficiency of which is hereby fully acknowledged, we, the undersigned NED G. MCINNIS, JR., and wife, MARY DEANNE MCINNIS, *do hereby assign, transfer and grant* unto BANCORPSOUTH BANK, a Mississippi state banking corporation, *all of our interest and right and title in* and to that certain Promissory Note dated November 14, 2003, executed by Ronson Construction Systems, Inc., in favor of Ned G. McInnis, Jr., and wife, Mary Deane McInnis, in the original principal amount of $664,683.90, and for the same consideration, the undersigned does also hereby *grant, bargain, sell, transfer and assign* over unto BancorpSouth Bank *all right, title and interest in and to* that certain Deed of Trust dated November 14, 2003, executed by Ronson Construction Systems, Inc., in favor of Ned G. McInnis, Jr., and wife, Mary Deane McInnis, which serves as security for the above referenced Promissory Note being assigned hereunder and which Deed of Trust has been filed of record in the office of the Chancery Clerk of Forrest County, Mississippi and Land Deed of Trust Book _____ at Page _____.

(Emphasis added).

¶40. The language in this assignment is strongly evident of the intent of the parties to assign all of the McInnises' rights to the Ronson note and deed of trust. However, as "the intention of the parties [is] ascertained from the entire transaction," this case is distinguished from ***McKinley v. Lamar Bank***; ***EB, Inc. v. Allen***; and ***International Harvester Co. v.***

17

***Peoples Bank & Trust Co.*** In those cases, the intent of the parties was primarily determined by the assignment. Here, in addition to the assignment, there is an Agreement, which provides the terms for Ronson's payments as well as for the McInnises' assignment in issue to BancorpSouth.

¶41. The Agreement is telling as to whether the parties intended to create an assignment which was absolute or intended only as collateral security. The Agreement, which was executed on the same day as the assignment, required that in consideration for BancorpSouth's agreement to refrain from exercising its option to accelerate the remaining balance due by the McInnises on the properties, the Contract for Sale between the McInnises, Hartman, and Ronson would be carried out in accordance with certain terms and conditions. One such condition was that at closing, the McInnises would assign the Ronson note and deed of trust. Further, Ronson would make monthly payments to BancorpSouth, and BancorpSouth would tender any residue to the McInnises. Likewise, upon final payment or pre-payment of the promissory note, BancorpSouth would pay off loans due and owing BancorpSouth from the McInnises for which the Ronson properties served as collateral, releasing all outstanding deeds of trust on the collateralized property. The language of the Agreement, which calls for creation of the assignment and provides for the tender of excess funds from payments to the McInnises and release to the McInnises of the assigned note and deed upon satisfaction of the Ronson note, suggests that BancorpSouth and the McInnises intended the assignment to serve only as collateral security.

¶42. Concerning the collection of an unsatisfied debt assigned as collateral security, this Court stated in ***Peoples Bank*** that the creditor assignee has priority over the assignor in

18

collecting on the debt obligation. "[A]n assignment of a deed of trust due by a debtor to the assignor as collateral security for an indebtedness due by the assignor to the assignee vest[s] the assignee with full legal title to the deed of trust." **Peoples Bank**, 402 So. 2d at 862. However, this title is limited, as the assignor has an "equity of redemption." **Id.** at 863. "An assignment that is made as collateral security for a debt gives the assignee only a qualified interest in the assigned chose, commensurate with the debt or liability secured. . . ." **Id.** at 862. With regard to rights between the assignor and assignee to collect on the debt, "[b]efore the debt secured is paid, the assignee is, to the extent of his interest, the owner of the collateral as against the assignor and creditors or others claiming under him. . . ." **Id.** Thus, BancorpSouth, has priority over the assignor, the McInnises, in collecting on the unsatisfied debt of the Ronson note, which was assigned as collateral security the creditor assignee.

¶43.    Hartman's argument that the McInnises assigned away all their rights regarding the Ronson note is without merit. In consideration of the entire transaction, the assignment of the note was intended only as collateral security. As such, the McInnises do have standing to sue for collection of payments on the Ronson note. However, as the note was tendered to BancorpSouth as collateral security, BancorpSouth had an interest in the Ronson note to the extent of the amount of the loan which the note secured. Further, BancorpSouth's interest was superior to the McInnises' interest. Accordingly, BancorpSouth is entitled to collect first the amount of the secured debt owed to it, and upon satisfaction of that debt, the McInnises are entitled to collect any remainder due on the note. The trial court erred in awarding the McInnises any monies due on the note before the debt to BancorpSouth which the note secured was satisfied.

**CONCLUSION**

¶44.    The trial court erred in holding that BancorpSouth was precluded from recovering a deficiency judgment. The trial court also erred in awarding the McInnises payment on the Ronson note when BancorpSouth had priority in collecting that debt and the debt to BancorpSouth had not yet been satisfied. Therefore, the judgment of the Chancery Court of Forrest County is reversed, and the case is remanded for a new hearing to determine whether or not a deficiency exists, the amount of any deficiency, and to distribute any such deficiency in a manner consistent with this opinion.

¶45.    **ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED.**

**WALLER AND DIAZ, P.JJ., AND LAMAR, J., CONCUR. CARLSON, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. GRAVES, J., CONCURS IN RESULT ONLY. DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, J. EASLEY AND RANDOLPH, JJ., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶46.     When called upon to interpret and apply statutes in recent years, this Court has moved toward a textualist policy, that is, a strict application of statutes as they are written.[2]  Today, this Court backslides.

¶47.     Hopefully, the majority opinion represents no more than a temporary departure – a brief lapse of judgment – by some whose voting record and frequently-proclaimed disdain for judicial activism suggest they would have rejected the majority's analysis (or lack thereof), and agreed with the view set out below.

¶48.     The majority's excellent disposition of the second and third issues belies its woefully inadequate and incorrect analysis of the first[3].  Having said that, I confess that, upon my first

_____

[2]*See e.g.* ***Allred v. Yarborough***, 843 So. 2d 727, 729 (Miss. 2003) (Diaz, P.J.) ("In considering a statute passed by the legislature, . . . the first question a court should decide is whether the statute is ambiguous.  If it is not ambiguous, the court should simply apply the statute according to its plain meaning . . .") (*citing* ***City of Natchez v. Sullivan***, 612 So. 2d 1087, 1089 (Miss. 1992)); ***Pitalo v. GPCHP-GP, Inc.***, 933 So. 2d 927, 929 (Miss. 2006) (Waller, P.J.) ("When interpreting a statute that is not ambiguous, this Court will apply the plain meaning of the statute.") (*citing* ***Claypool v. Mladineo***, 724 So. 2d 373, 382 (Miss. 1998)); ***Arceo v. Tolliver***, 949 So. 2d 691, 695 (Miss. 2006) (Carlson, J.) ("When interpreting a statute that is not ambiguous, this Court will apply the plain meaning of the statute.") (*citing* ***Claypool v. Mladineo***, 724 So. 2d 373, 382 (Miss. 1998)); ***Garrison v. State***, 950 So. 2d 990, 1002 (Miss. 2006) (Graves, J. concurring in part and dissenting in part) ("When interpreting a statute that is not ambiguous, this Court will apply the plain meaning of the statute.") (*quoting* ***Arceo v. Tolliver***, 949 So. 2d 691 (Miss. 2006)); ***Gilmer v. State***, 955 So. 2d 829, 834 (Miss. 2007) (Smith, C.J.) ("When a statute is unambiguous, this Court applies the plain meaning of the statute and refrains from the use of statutory construction principles.") (*citing* ***Pinkton v. State***, 481 So. 2d 306, 309 (Miss. 1985)); ***Lamar v. Thomas Fowler Trucking, Inc.***, 956 So. 2d 878, 881 (Miss. 2007) (Dickinson, J.) ("Additionally, we apply the plain meaning of the statutes to the issues before this court.") (*citing* ***Walker v. Whitfield Nursing Ctr., Inc.***, 931 So. 2d 583, 590 (Miss. 2006)); ***Caldwell v. N. Miss. Med. Ctr., Inc.***, 956 So. 2d 888, 893 (Miss. 2007) (Easley, J.) ("This Court applies the plain meaning of the statute when the statute is not ambiguous.") (*citing* ***Claypool v. Mladineo***, 724 So. 2d 373, 382 (Miss. 1998)); ***Laurel Yamaha, Inc. v. Freeman***, 956 So. 2d 897, 905 (Miss. 2007) (Randolph, J.) ("This Court is bound by the plain meaning of these statutes . . .") (*citing* ***Miss. Dep't of Transport v. Allred***, 928 So. 2d 897, 905 (Miss. 2007)).

[3]I do not disagree entirely with the majority's disposition of the first issue.  In my view, it correctly analyzed the fiduciary duty issue (discussed in I.A. of the majority).  And my only disagreement with the majority's section I.B. 1., is the judicial imposition of the " commercial

reading of Chief Justice Smith's impressive majority opinion, I was inclined to join his conclusion that BancorpSouth – having failed to establish the fair market value of the foreclosed property – deprived itself of a deficiency judgment.[4]  After all, the majority crafted a facially persuasive case for the proposition by its citation of this Court's precedent which has morphed and evolved over the years, ever expanding and rewriting the law to its present state.

¶49.    However, upon second reading, I was disturbed that the majority included no citation of statutory authority for the "fair-market-value" requirement imposed upon foreclosing creditors.  The absence of authority, of course, pricked my curiosity.  How, why, and when did the obligation to establish the fair market value of foreclosed property creep into our law?  Surely, I thought, the strict constructionists with whom I serve on this Court – justices who frequently eschew judicial activism and proudly proclaim that we "apply statutes as they are written" – didn't just make it up.

¶50.    Unfortunately, the evidence conclusively demonstrates that, although my colleagues were not directly involved, justices on this Court in previous years did just that, that is, they simply "made it up."  I do not make this charge lightly.  Indeed, I have great respect for the venerable justices who have served this State and its citizens over the decades, and I shall in this opinion endeavor to document and support my views.

---

reasonableness" standard into our statutory law.  It is the majority's discussion in section I.B.2., of fair-market value, that is the focus of this dissent.

    [4]The majority doesn't actually deprive BancorpSouth of its deficiency judgment – at least, not yet.  Having found BancorpSouth failed at trial to meet its judicial burden of proving fair-market value, the majority inexplicably provides it another opportunity by remanding the case for another trial.

¶51. Because the majority decides the fair market value issue based on precedent which, in my view, judicially amended Mississippi law; and because judicial tampering with statutory and contractual rights is neither authorized nor supported by our constitution; and because this issue strikes at the very heart of the powers granted to the Legislature and threatens the checks and balances of our tripartite form of government; I must (as to the fair-market value issue) respectfully dissent.

**I.**

¶52. To begin, I point out that the majority decided the fair-market issue by employing a law that was completely created by the judiciary. Consequently, the majority cites no statutory authority. Some have argued that, despite the absence of statutory authority, the majority's decision is nonetheless justified by a long-standing line of cases dating back over a century. This argument fails for two reasons.

¶53. First, the doctrine of *stare decisis* neither requires nor justifies the blind application of incorrect principles of law. Were it otherwise, we might still have segregated schools and all-male juries. As once noted by Justice Felix Frankfurter: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Bank*, 335 U.S. 600 (1948) (Frankfurter, J, dissenting). If Justice Frankfurter's reasoning does not suffice, then the second reason presents an argument more persuasive even than the first.

¶54. The early cases (discussed below) actually serve as no authority for the majority's conclusions. After carefully reviewing these cases, I find they (the early cases) were indeed grounded in statutory and common law and, thus, decided correctly. Unfortunately, however,

23

more contemporary Courts carefully excised from these early opinions certain selected sentences – completely out of context – and cited them for new propositions of law which suited the justices authoring the opinions.

¶55.   One such judicially-created law provides that foreclosing creditors who bid at foreclosures – but do not establish the fair market value of the foreclosed property – will forfeit their statutory right to a deficiency judgment.  This judicial requirement is not some time-tested law, respected and followed from ancient days.  The fact is (as will be shown below), previous justices on this Court injected the fair-market-value requirement into our case law less than twenty-five years ago.

**II.**

¶56.   The facts in this case are not complicated, and are essentially undisputed.  Between the debtor, Ronson, and the creditor, BancorpSouth, there are two contracts:[5] a promissory note and a deed of trust.  Neither of these instruments has been challenged under any theory of contract law.  Ronson, breached the first contract (the note) by failure to repay the loan according to its terms. BancorpSouth then exercised its rights pursuant to the second contract (the deed of trust) by instituting a foreclosure proceeding.  Pursuant to its statutory authority to do so, BancorpSouth bid at the foreclosure sale.  The amount bid at the sale resulted in a deficiency.

¶57.   The record indicates that, in proceeding with the foreclosure and conducting the foreclosure sale, BancorpSouth and the trustee followed every statutory and contractual

---

[5]The note's original creditors, Ned and Mary McInnis, assigned their note and deeds of trust to BancorpSouth.  Thus, BancorpSouth is sometimes referred to herein as the creditor.

24

requirement to the letter of the law. Nevertheless, the majority denies BancorpSouth its application for a deficiency judgment[6] (as specifically allowed by statute), stating two reasons, neither of which can be found in any statute.

¶58. First, the majority claims that BancorpSouth did not, "satisf[y] the court that [a deficiency judgment] would be equitable." Second, it concludes that in order to receive its deficiency, BancorpSouth was required to "establish fair market value of the property." At the risk of redundancy, I again point out that neither of these judicially-created requirements can be found in the contract, or in any statute.

¶59. While the majority cites adequate precedent from previous Courts to support its conclusion, we cannot – and should not – allow precedent to blind us to our constitutional duty to follow the law. Regardless of statements and holdings from this Court's previous cases, our duty remains the same. We must follow the law – not create it. And where statutes have been impermissibly modified by previous Courts, it becomes our responsibility to restore the law as written by the Legislature. Rather than facing and fulfilling this important responsibility, the majority validates and further entrenches this Court's past errors, creating a durable web of confusion for generations to come.

## III.

*Shocking the Court's conscience is evidence of fraud.*

¶60. The seed of the majority's holding today was planted in 1848, when this Court reviewed a challenge to a foreclosure sale in ***Taylor v. Eckford***, 19 Miss. 21 (1848). Although the land was worth six thousand dollars, it was sold for two dollars. This Court

---

[6]See footnote 4, above.

held that the price paid "shocks the conscience" of the Court, and that the "gross inadequacy of the price, the relation of the parties, and the numerous and various efforts made to defeat the title [of the owners], furnish the most convincing evidence of *fraudulent and improper practices*." *Id*. at 22 (emphasis added). *See also **Baldwin & Eskridge v. Jenkins & Lucas***, 23 Miss. 206 (1851) (sale of land for less than half its value "is a circumstance, though of no very conclusive character" of fraud); ***Huntington v. Allen***, 44 Miss. 654 (1871) (same).

¶61. Thus, the Court's holding in ***Taylor*** stood for nothing more than the perfectly acceptable and appropriate proposition that a price so inadequate as to "shock the conscience" is one element which may be considered to demonstrate fraud which, if committed, certainly justifies setting aside a foreclosure sale. Because there is no issue of fraud before us today, however, these cases are inapposite.

¶62. The issue was revisited in 1875, when this Court reviewed a challenge to a commissioner's sale in a partition action in ***Swofford v. Garmon***, 51 Miss. 348 (1875). The bidders at the sale secretly agreed to a bidding scheme in order to hold down the price. This Court observed that "the land was worth from $1,000 to $1,200, one-third more than it brought at the sale." In setting aside the sale, this Court held:

> Inadequacy of price, where the sale has been fair and in conformity to the decree, will not, unaided by other circumstances, be sufficient to set aside the sale, unless the inadequacy be so gross *as to suggest fraud*.

*Id*. at 351 (emphasis added). Again, the gravamen of the holding in ***Swofford*** was fraud. And again, there is no issue of fraud before us today.

*The fraud requirement begins to fade.*

26

¶63. The demise of the fraud requirement began with the 1907 case of ***Weyburn v. Watkins***,[7] wherein this Court casually mentioned <u>in dictum</u> that "the sale of land . . . will not be set aside for mere inadequacy of price, unless the inadequacy is such as to shock the conscience." ***Id***. at 735. For reasons not apparent and unexplained, the ***Weyburn*** Court omitted any reference to fraud. Here lies an excellent example of how the slightest misstatement or omission, even in dictum, can quickly lead to unwarranted changes in the law. Prior to ***Weyburn***, an inadequate price which shocked the Court's conscience was accepted as relevant evidence of fraud, but it had been insufficient, in and of itself, to set aside a foreclosure.[8] With ***Weyburn's*** *obiter dictum* – unaided by the context provided in previous cases which clearly related the inadequate price to fraud – later Courts and less careful justices would be influenced to hold that an inadequate price which shocks the conscience was a sufficient ground to set aside a foreclosure, with no mention of the necessary nexus to fraud. Indeed, ***Weyburn's*** omission of this minute detail was to prove important in this Court's gradual emasculation of the foreclosure statutes. In cases following ***Weyburn***, this Court continued to employ its newly conceived "shock-the-conscience" test with vigor, and the previously-required fraud element simply disappeared.

¶64. Interestingly, the price the creditor paid at the foreclosure sale in ***Weyburn*** apparently did not shock the Court's conscience, because the sale was confirmed. Nevertheless,

---

[7] 90 Miss. 728, 735 (Miss. 1907)

[8] The challenge in ***Weyburn*** came only after the foreclosure was completed, a deficiency judgment was obtained, and the creditor sought to collect the deficiency judgment. Nevertheless, the challenge was to the validity of the sale, rather than an attack on the deficiency judgment.

creditors had been placed on notice that, in Mississippi, shocking this Court's conscience was not allowed.

*The "equitable" requirement.*

¶65. In 1979, this Court decided ***Mississippi Valley Title Insurance Company v. Horne Construction***, 372 So. 2d 1270, 1272 (Miss. 1979). Rarely does a case so profoundly change the law, without citation to a single case or statute.[9]

¶66. After instituting foreclosure of a deed of trust securing a construction loan, the mortgagee, First Memphis Realty Trust ("FMRT"), purchased the property at the foreclosure sale. Finding that the sale price did not cover the entire debt owed, FMRT petitioned the chancery court for a deficiency judgment. The mortgagor, Roell Development Corporation, challenged the deficiency, arguing that FMRT was partly responsible for the default because it had not properly funded the construction loan.

¶67. The chancellor held that FMRT was justified in instituting the foreclosure, and the price it paid for the property at the foreclosure sale was "not unreasonable." ***Id***. at 1271. Nevertheless, the chancellor denied FMRT's application for a default judgment because "there seems to be some element of high-handedness in the moving to protect their position (FMRT) which left the relative positions of the two parties, Roell and FMRT, on nothing like an equal basis." ***Id***. In explaining the "high-handedness," the chancellor stated:

> Roell had good reason to believe that FMRT was going to pay the additional $500,000 necessary to complete the project and while [Roell] *violated the written agreement* between the parties by virtue of the transfer of title to RODA, it seems to the Court to be something which *could have been waived*

---

[9]The only citation found in the entire case is a paragraph from the legal encyclopedia, *Corpus Juris Secundum*, discussed later.

28

*by FMRT* but did not have to be. Under the circumstances, it would have been extremely difficult for Roell to have found alternative financing in time to prevent the foreclosure.

*Id*. (emphasis added). Basically, the chancellor frowned upon FMRT's failure to waive its perfectly legal right under its written contract, and worried about Roell's ability to find additional needed financing.

¶68. On appeal, the *Mississippi Valley Title* majority stated simply that "the finding of the chancellor will not be overturned unless this Court finds him to be manifestly wrong." *Id*. at 1272. Thus, like the chancellor, the *Mississippi Valley Title* majority seemed quite comfortable with overlooking Roell's double breach of the contract,[10] and FMRT's statutory right to a deficiency judgment. The Court upheld the foreclosure sale, but nonetheless denied FMRT its deficiency judgment. This statutorily unsupported result was justified by the *Mississippi Valley Title* majority by adopting the following language from the chancellor's opinion:

> While we[11] cannot say the price paid at the foreclosure was too low, nevertheless, it was a price set by FMRT, and there is evidence in the record indicating that the property is worth more than the amount owed altogether, and only a short time before foreclosure, FMRT was willing to put $500,000 more into the property. Under these circumstances, *it does not seem equitable* for FMRT to have been allowed to move on the foreclosure basis, establish a price which left them entitled to, on the face of it, a substantial deficiency judgment and reap whatever benefits might come from that as well as owning the whole property. Therefore, the Court finds that FMRT is not entitled to a deficiency judgment or cost of collection against Roell.

---

[10]Roell not only defaulted on the note by failure to make payments, it also breached an agreement not to transfer title to the property. *Id*.

[11]The use of the pronoun "we" by the chancellor seems to be an error.

*Id.* at 1271 (emphasis added). In affirming the chancellor, this Court also cited with approval the chancellor's finding that "the 'high-handedness' of FMRT left the parties on 'nothing like an equal basis.'" *Id.* at 1273.

¶69. At first reading, it is difficult to fully appreciate *Mississippi Valley*'s departure from established law. Prior to this amazing decision, creditors who didn't commit fraud, didn't shock the Court's conscience, and observed all statutory requirements in conducting foreclosure sales, were virtually assured that their contractual and statutory right to a deficiency judgment would be upheld by this Court.

¶70. With *Mississippi Valley*, however, mortgagees had new requirements to meet and obligations to fulfill. They must not be "high-handed." They must, in some cases, waive their rights. And above all, they must satisfy this Court, not only that they have the legal right to a deficiency, but also that a deficiency judgment would be "equitable."

¶71. It is important to emphasize that the *Mississippi Valley* Court accomplished this significant change in the law <u>without a single citation, anywhere in the entire case, of a case or statute</u> from Mississippi (or any other state for that matter). The only citation in the entire opinion was the following paragraph from a legal encyclopedia:

> The mortgagee's right to a deficiency decree usually depends on the facts and circumstances of each case, and, since the mortgaged premises constitute the primary fund for the payment of the mortgage debt, it is only where the mortgagee has endeavored to collect it out of the land that a just judgment for deficiency can be entered. While it has been held that the power to render a deficiency decree is governed by the rules which would apply at law, it has also been held that the court has jurisdiction after a foreclosure sale to determine any intervening fact which would make it inequitable to enter a deficiency decree. *Accordingly, no right to a deficiency judgment vests until plaintiff satisfies equity that it would be equitable, in the light of the sale price, to authorize a deficiency judgment.*

30

59 C.J.S., *Mortgages* § 778, p. 1474 (1949) (emphasis added). As will be shown, however, the assertion stated in the C.J.S. encyclopedia, and cited in ***Mississippi Valley***, is supported by no law. The article footnotes only two cases from which the "equitable" requirement was derived; one from Illinois, and the other from New York.

¶72. The Illinois Court of Appeals case of ***Collins v. Baim***, 299 Ill. App. 405, 413 (Ill. App. Ct. 1939), addressed the "equitable" question of whether or not a bond owner who was not a party to the deficiency decree was entitled to the benefits from that decree. ***Id***. at 413. The result turned on principles of *res judicata*, and had nothing whatsoever to do with requiring an equitable price at a foreclosure sale. ***Id***.

¶73. The New York case, ***Monaghan v. May***, 242 A.D. 64, 66-67 (N.Y. App. Div. 1934), was handed down by the Supreme Court of New York in 1934. There, it was held that a court of equity could deny a deficiency decree when the price of the underlying foreclosure sale made it inequitable to do so. ***Monaghan***, 242 A.D. 64, 66-67 (N.Y. App. Div. 1934). The New York court's rationale closely mirrors this Court's holding in ***Mississippi Valley***. However, ***Monaghan*** is easily distinguished from the case before us today by one crucial fact – Mississippi's legislature has enacted a statute which addresses (and, in my view, controls) the creditor's right to a deficiency. As of 1934 when ***Monaghan*** was handed down, New York's legislature had not. *See **Id.*** at 67 (*citing **Home Bldg. & Loan Ass'n v. Blaisdell***, 290 U.S. 398, 446 (1934)).

¶74. The United States Supreme Court case of ***Home Building and Loan Association v. Blaisdell***, 290 U.S. 398, 54 S. Ct. 231, 78 L. Ed. 413 (1934), preceded ***Monaghan*** by six months, and was the sole authority the New York court cited in its ***Monaghan*** opinion. The

31

*Blaisdell* Court opined that "*[i]n the absence of legislation*, courts of equity have exercised discretion in suits for the foreclosure of mortgages to fix the time and terms of sale and to refuse to confirm sales upon equitable grounds where they are found to be unfair or inadequacy of price was so gross as to shock the conscience." *Blaisdell*, 290 U.S. 398, 446, 54 S. Ct. 231, 78 L. Ed. 413 (1934) (emphasis added). The first five words quoted above from this United States Supreme Court authority sum up nicely the reasoning for my dissent.

¶75.   As stated above, our Legislature has, indeed, enacted legislation which controls a creditor's right to a deficiency. *See* Miss. Code Ann. § 11-5-111 (Rev. 2002). Thus, the *Monaghan* decision simply has no application here and therefore, the C.J.S. encyclopedia article cited in *Mississippi Valley* also is wholly inapposite to the case before us.

**IV.**

¶76.   Following this quantum leap in *Mississippi Valley*, this Court fired its next attack on strict statutory construction and the separation of powers (in the foreclosure context) in *Lake Hillsdale Estates, Inc. v. Galloway*, 473 So. 2d 461 (Miss. 1985). And as it had done previously in *Weyburn*, the *Lake Hillsdale* Court again used dictum as ammunition.

¶77.   In *Lake Hillsdale*, the mortgagor sued the mortgagee and the trustee, alleging numerous deficiencies in the foreclosure sale and the deficiency decree. Finding no reversible error on procedural grounds, and no breach of duty by the trustee, this Court turned to the adequacy of consideration paid at the foreclosure sale.

¶78.   The price paid was first evaluated in the context of whether it was insufficient to sustain the foreclosure sale. This Court observed that "the chancery court made no finding of fair market value of the property. Absent that value, this Court cannot find that the sale

32

price was such that shocks the conscience of the court." Thus, the chancellor's refusal to set aside the sale was affirmed.

¶79.  This holding in *Lake Hillsdale* is significant, not because this Court again used the "shock-the-conscience" test in evaluating whether to set aside the foreclosure, but because the Court made it clear that the burden was on the mortgagor. That is to say, the mortgagor must provide the proof necessary to convince the Court that its conscience has been shocked and, absent that proof, the foreclosure will be upheld.

¶80.  The *Lake Hillsdale* Court turned next to the deficiency judgment, stating that:

> Our decision in *Mississippi Valley Title* makes it clear that something more than a difference between the price paid at the foreclosure and the amount of the indebtedness must be demonstrated before the mortgagee is entitled to a deficiency judgment. . . . Though we have concluded that the price paid at the foreclosure sale was not so inadequate as to require setting aside the sale, we cannot conclude that the value of the property thereby obtained is insufficient to satisfy the indebtedness of the mortgagor. In any case, no proof to that effect has been offered by the [mortgagee].
>
> We hold, consistent with our decision in *Mississippi Valley Title Insurance* that in order to obtain a deficiency judgment, the mortgagee has the burden of proving its entitlement under principles of equity to a deficiency judgment. We reverse the court's ruling and remand for a new hearing to first determine if the mortgagee has endeavored to collect the indebtedness out of the land. Then, it must be determined whether the value of the property satisfies the debt of the mortgagor or *creates a surplus*.[12] Only then can a decision be made as to the propriety of [the deficiency judgment].

*Id*. at 466 (emphasis added).

¶81.  Therefore, the *Lake Hillsdale* Court placed the burden of proof on the mortgagor with respect to setting aside the foreclosure sale, and upon the mortgagee with respect to the

---

[12]The Court's use of the term "surplus" is interesting. One wonders if the *Lake Hillsdale* Court envisioned some mortgagees actually writing checks to mortgagors following foreclosure sales.

deficiency. More important, however, was the *Lake Hillsdale* Court's bold statement that meeting the requirements of Section 11-5-111will not suffice to entitle a mortgagee to a deficiency. "Something more" would be required. *Id*. at 466.

*Duty to establish market value.*

¶82. A few years later, this Court again advanced the ball. In *Haygood v. First National Bank of New Albany*, 517 So. 2d 553 (Miss. 1987), the mortgagee obtained a deficiency judgment, and the mortgagor appealed. On appeal, this Court harkened back to *Weyburn* (but no further, lest that pesky fraud requirement be noticed and, perhaps, revived) to recall that "[i]nadequacy of price is insufficient to set aside a foreclosure sale unless the price is so inadequate as to shock the conscience of the Court." *Id*. at 556. The *Haygood* Court – after reciting the ratio of the bid-to-market-value found in several cases, including *Weyburn*,[13] – then held:

> The legal determination of the adequacy of the purchase price depends upon establishment of fair market value. *Lake Hillsdale Estates, Inc. v. Galloway*, 473 So. 2d 461, 465 (Miss. 1985). We are of the opinion that the fair market value of the property is an issue of material fact in the case at bar and that the value of the property constituted a genuine issue which should have been submitted to the jury . . . .

*Haygood*, 517 So. 2d at 556.

¶83. Thus, *Lake Hillsdale* and *Haygood*, read together, established that a debtor challenging a deficiency judgment could simply file the complaint, after which the burden of proof immediately shifted to the mortgagee to establish the fair market value of the

---

[13]The *Haygood* Court incorrectly stated that, in *Weyburn*, "40% of fair value was unconscionable." *Haygood*, 517 So. 2d at 556. The *Weyburn* decision included no such finding.

property in order to prove that the price paid at foreclosure was equitable. Apparently impressed by the ease with which it had changed, and added to, the statutory requirements regarding foreclosure sales, this Court found it had more to do.

**V.**

¶84. The final assault (prior to the majority's decision today) on the legislative prerogative expressed in Mississippi's foreclosure statutes came in ***Wansley v. First National Bank of Vicksburg***, 566 So. 2d 1218 (Miss. 1990). There, the creditor bank, as the only bidder at the foreclosure sale of two deeds of trust of property held by two brothers, bid $500,000 for each brother's interest." *Id*. at 1219. The bank then sought and obtained a deficiency judgment against the two brothers, one for approximately $500,000, and the other for approximately $230,000. *Id*. at 1220.

¶85. In seeking to have the foreclosure and deficiency set aside, the brothers "argued that the Court should void the foreclosure because the Trustee . . . was personally financially interested in the Bank and hence was not an impartial and disinterested trustee." *Id*. In analyzing the brothers' challenges, the *Wansley* Court began by stating:

> In today's context, our focus has been – and is – upon assuring that the debtor is given credit toward his obligation in an amount fairly reflecting the market value of the collateral, all to the end that he may not be saddled with an inequitable deficiency judgment.

*Id*. at 1221. The *Wansley* Court was unwilling, however, to confine itself to the previously-adopted "shock-the-conscience" or "equitable" tests. After waxing eloquent on the general nature and philosophy of foreclosure sales and trustees, the *Wansley* Court paraphrased language from *Lake Hillsdale* and *Haygood*, and likened it to a requirement that the "terms

35

of a foreclosure sale must be commercially reasonable." *Id*. at 1224. The *Wansley* Court, after inexplicably looking to Mississippi's Uniform Commercial Code (which addresses the requirements for a creditor's sale of <u>personal property</u> held as collateral[14]), concluded: "We see no reason on principle why a similar rule should not govern disposition of real property held as collateral and foreclosed upon." *Id*. at 1225.[15]

¶86.     Thus, with the judicial amendments provided by *Mississippi Valley Title*, *Lake Hillsdale*, *Haygood*, and *Wansley*, a mortgagee who follows every statutory requirement for foreclosure and a deficiency judgment will nevertheless be denied the deficiency unless such mortgagee establishes that:  1)  the foreclosure sale was conducted according to the guidelines set out in the Uniform Commercial Code;  2)  the bid was high enough to be deemed "equitable" by a reviewing Court (when compared to the market value of the property); and 3)  it was not "high-handed."  Which brings us to today's case.

**VI.**

¶87.     It seems to me that a foreclosure sale sufficiently flawed so as to deprive a creditor of a deficiency judgment should be set aside altogether.  However the majority upholds the sale, finding it perfectly legal and commercially reasonable, but denies Bancorp its deficiency judgment[16] because it did not present enough evidence to establish fair market

---

[14]The statute required that, when selling personal property held as collateral, "every aspect of the disposition, including the method, manner, time, place and terms, must be commercially reasonable."  Miss. Code Ann. § 75-9-504(3) (1972).

[15]To its dubious credit, at least the *Wansley* Court did not attempt to disguise or justify its blatant statutory amendment by calling it a statutory interpretation.

[16]See footnote 4, above.

36

value of the properties. Thus, the foreclosure was good enough – and legal enough – to satisfy the majority that the sale should not be set aside; but it was not good enough to allow the creditor to obtain a deficiency judgment, even though a deficiency judgment is unquestionably justified under the terms of the contract and the provisions of our foreclosure statutes. I am unable to agree with such an illogical and unjustified approach to the application of statutory and contract law.

¶88.    For the reasons previously stated, I would eliminate any requirement regarding the conduct of the sale which materially deviates from the requirements of our foreclosure statutes and the contractual agreement of the parties. Furthermore, I would discard the requirement that the mortgagee prove fair market value of the property. Both of these constraints were entirely created by the judiciary.

¶89.    My dissent should not be read to imply that I believe a debtor facing foreclosure should be deprived of the opportunity to present all available legal and equitable defenses. For instance, the law does not condone a fraudulently conducted foreclosure sale, and the common-law defense of fraud had been around since before Henry VIII. However, absent fraud or some other common-law defense (equitable or legal), a result that some justice or another considers to be an inequitable is not an appropriate basis for this Court to ignore statutes and deprive a party of enforcement of a valid contract. If it were otherwise, our courts would be in the business of monitoring all business transactions to ensure that all contracting parties get what a majority of justices on this Court consider to be a fair deal.

¶90.    I do not deny that strict enforcement of statutes can sometimes produce harsh results. As pointed out in **Lake Hillsdale**, "Unlike other states, our statute provides no statutory

safeguards for mortgagors subject to deficiency judgments." *Lake Hillsdale*, 473 So. 2d at 466 (internal citation omitted). While some justices may question the wisdom of such an omission by the Legislature, I strongly believe that – absent the suggestion of a constitutional violation[17] – we must defer to the Legislature on questions of the fairness of statutes, and the need for statutory amendments. Unless and until it does, I respectfully submit that our hands are constitutionally tied.

¶91. The natural desire and temptation to amend legislation when we think it's a good idea must give way to our constitutional duty to defer to the Legislature on such matters, excepting only cases where we find in a statute or its application a constitutional violation.

¶92. The Justices comprising the majority in today's decision are persons I admire and respect. And I am convinced that a majority of this Court is committed to both the doctrine of separation of powers and the rejection of judicial activism. Nevertheless, backsliding can take place on a court as easily as in a church. True justice in the constitutional sense is accomplished only when we follow the law as it is written. Perhaps, in some future case, this Court will see fit to return to the language of the statute which was created by those who actually have the constitutional power to create statutes. It is, in my view, unfortunate that today is not that time. For the reasons stated, and only as to the fair-market value issue, I respectfully dissent.

**CARLSON, J., JOINS THIS OPINION**.

---

[17]For instance, in a foreclosure case where a Fourteenth Amendment due process violation is asserted in the trial court and on appeal, this Court must then determine whether the foreclosure, as conducted, and the results obtained, deprived the mortgagor of property without due process of law. That issue is not before us in this case.